Fanshawe College Level 1, www.fanshawec.ca We will hear argument next in No. 18-2223, Valencell vs. Fitbit. May it please the court, I'm Justin Kimball on behalf of Valencell. First, the board erred by exceeding its statutory authority to substitute its own theory for the theory that Fitbit had advanced to find the claim light guide in Numaga. The Supreme Court in SAS explained that because IPRs are party-led, not agency-led proceedings, the board cannot depart from the petition and institute an IPR of its own design. That's exactly what happened here. The claim term at issue is light guide, and the state of construction is mechanism for delivering light along a path, which Valencell agrees with. Numaga's invention, for some context, was to press an encapsulated light emitter directly into the skin in order to get as much light directed onto the skin as possible. The change that made to the prior artists described in Numaga was to remove some intervening components so that that encapsulated light emitter could directly touch the skin. Numaga doesn't teach anything about using light guides to deliver light along a path as does the 965 patent. Fitbit contended in its petition that this encapsulated part, it's called light guide part 21B, was alone the claimed light guide. That surrounding material, shell support number 29, was the housing. That was the housing for the emitter and the detector. I guess this is what I'm remembering. The petition says 21A was the light guide. You responded, can't be the lights not sufficiently cabined. There's going to be a problem with that. They come back and they say, look, your own patent allows some kind of cladding on the light guide. And Numaga has that in, is that either 26 or 29, one of those? 29. 29. So that's a response to your argument that 21 can't really be a light guide because there's not enough protection for it. That doesn't make the cladding part of the light guide. So Fitbit was very careful in its argument. So the sequence is important. We did say in our preliminary patent owner response that the 21B couldn't be a light guide. It didn't deliver light in any particular way. Numaga doesn't say anything about that. The board on its own said, well, what about other parts within Numaga in particular, this shell support number 29? Doesn't that deliver light along a path? That was not Fitbit's contention. And we then, in our patent owner response, continued to point out, responding to the petition, not to the board. You were talking about an institution decision now? Yes. Okay. Yes. If I misspoke, I'm sorry. No, no, no. I may have just not been paying attention. That sequence is important. So yes, in the institution decision, the board introduced this idea that the shell support member could deliver light along a path. That wasn't what Fitbit contended, either in the petition or later. Where's the institution language you're talking about? That is— And secondarily, then, did the board rely on the final written decision? Yes, so the— And I guess what I want to focus on is when you say can't deliver without, that doesn't mean the thing that's necessary is part of the light guide. That is, the cladding may enable the light guide to do its job as a light guide without being part of the light guide. So— And that is at least how I remember what the board said. So we read it a different way to respond to that question. We read it to be that the shell support member, which later came to be known as cladding, was a part of the light guide. That in connection with the singular piece 21B. What's the closest you have to where the board said that? Sure. Part of the light guide. Appendix 907. And the quote is, or a portion of the quote is, Shell support member 29 thereby provides a mechanism for delivering light along a path. That's pretty unequivocal. Okay, and then what about the final written decision, which is presumably more fully considered than the institutional decision? Right. In the final written decision, it's Appendix 17, the board says, Numaga teaches transmitting light from an emitter through a clad light guide directly to and from the skin of the subject. So this clad light guide is referring to some combination of shell support member and the encapsulated piece 21B. And so we had argued throughout that 21B, which was what Fitbit consistently argued was the light guide, just could not be because it didn't deliver light along the path. The board was not authorized under the APA to come up with its own theory to fix a gap, a problem in the theory of Fitbit. But that's what it did here, and that is what the finding of obviousness with respect to Numaga is based upon. Your patent spec talks about some form of cladding, right? Yes, Your Honor. And that's to keep exterior light from entering the light guide, is that right? That's right, in a particular embodiment, that's right. And isn't that what's going on in Numaga too? They call it a light shutting off property or something like that. So I guess what I'm trying to figure out is why isn't the shell member 29 that's doing this kind of cladding the same thing that's going on in your patent disclosure? So in the patent disclosure, it does talk about... ...off into all sorts of areas beyond the light guide part. The support member is really more designed to stop sunlight or some kind of other exterior light from interfering with the light coming from the optical emitter through the light guide part. Numaga is a very short reference. It doesn't really explain a lot about what it's doing with the shell support member. It does talk about, in at least part, preventing some sort of crosstalk between the light emitter and the light detector. It also acts as a housing. Fitbit contends that it constitutes the claimed housing, the shell support member, not the light guide. With respect to the patent, it's true that there are some light guides in the patent that can use light cladding. But the patent consistently talks about, cladding or not, that light guides are used to deliver light in a particular way for a particular purpose. They're trying to focus light. The whole purpose of the patent is to use these light guides to focus light in a particular place to enhance sensitivity. This was one of the keys to their invention. There's a particular description of this with respect to an embodiment in the ear and the need to use a light guide to really focus light in a particular way. What is it about Numaga's quote-unquote light guide part that, in your view, is failing to serve the same function as your claimed light guide? Our problem with that is that Numaga doesn't talk about trying to deliver light or any words around that, not just those exact words. No discussion about focusing or anything else. That's not its goal. In fact, its goal, as opposed to that, is to get as much light onto the skin as possible, which is antithetical to what the 965 was trying to do. Remember, the prior art in Numaga had these intervening pieces, and it removes those so that the light emitter is right on the skin and shining as much light as possible. There's just no disclosure in Numaga of using a light guide in any fashion. Because of that lack of disclosure, the claimed light guide just isn't there, and it's certainly not there with respect to… So then Numaga's quote-unquote light guide part is some kind of misnomer, in your view? Well, it's hard. Who knows what it means? What we do know is light guide in the patent has been construed to mean a mechanism for delivering light along a path, and that's because of various discussions within the patent of doing that. So it's a particular light guide. It's got a construction, and Numaga doesn't address that. That's pretty broad. Numaga doesn't have to use those words, even the term light guide or the construction, for the board to say, this is what this is doing. Agreed. It doesn't have to use the same words. Our point is just that it's not just that. It's that Numaga's approach is totally different. It isn't trying to direct, control the light in any way. It's just shining light onto the skin. So it's just not using a light guide under any… It's not delivering light, I should say, in any fashion. If I may, may I move on to the Freighton reference? It's your time. So that's the second error. There what the board did was, the term is distal end, and the construction is end opposite of the proximal end. What the board did in finding a distal end in Freighton was it read the word opposite totally out of this construction. What it said, in fact, so if the figure is figure 10 in Freighton and it's an air plug, it's got these ribs along the side. What about the most distal rib, 64, the furthest from the proximal end? Why wouldn't that be opposite of the proximal end? So the issue is, so I understand the piece you mean. The tip, if I'm using my pen, the tip of the plug, that's the distal end. Now we would not say that the area just down from the tip, which is where those farthest most ribs are. I thought those farthest most ribs really come right off the most distal point you could locate on that. Well, there's sort of a portion of this piece, and I grant you that, but there's a clear end that is not engaging the body. That is our focus here, because the claim requires that that distal end engage the body. The reason Freighton doesn't have that end engage the body is because it would be engaging the inner ear and there could be damage. So that's the reason Freighton's built that way. I also would say that if you look at the description around Freighton in Figure 10, it shows that light coming back into the first side rib. There is no discussion explicitly of light coming in any of the other further most ribs either. But in addition to all of that, a side of this device is not a distal end opposite. The construction is end opposite of the proximal end, so it needs to be an end opposite the proximal end. Our contention is these side ribs just can't be that. What the board did to address this concern, which we had argued, is it said in qualification that they did not limit distal end to mean any particular end, or be limited to a single end at the farthest distance of the proximal end. In our view, this is essentially a reconstruction right at the end that vitiates the word opposite and really seems to make the word opposite meaningless. It seems to say, well, a distal end is just an end that isn't the proximal end, just some other end you can find. It's just not the broadest reasonable meaning. Would you agree that it's not in the middle, though? It at least is toward the end more than it is in the middle of the device, right? With respect to the rib that Judge Chen was bringing up, certainly. Look, I think there's three along the side there, and one is more in the middle and less in the middle. I agree. Yes, we would agree with that. But they are all along the sides, and the distal end of that plug doesn't engage. I understand, but your view is the more narrow distal end just on the opposite side at the same longitude, if you will. Yes, Your Honor. As I'm losing time here, I want to be sure. Are you going to talk about the motion to amend? Yes, Your Honor. I want to talk to you for a minute about corroboration. On the corroboration point, I see what your argument is on the rule of reason, but when I looked at the Board's decision, I thought that perhaps it did more than just find that there wasn't corroboration, and this is on the antedate Haisley section. If you look at page 846 in the first paragraph, the Board seems to suggest that it says, Petitioner notes several shortcomings in patent owner's evidence. This is evidence to antedate Haisley, and it says, We agree with Petitioner, and then it goes through the different evidence. It says that the prototype images are of insufficient detail. It says the chart doesn't include an explanation of how the images illustrate some of the claim components. It says that although there is the inventor declaration, it fails to explain how some of the limitations are present, kind of sounding as if they're saying it's conclusory. Then it's not until the next paragraph that the Board says, Inventor Steven LaBouffe is also patent owner's co-founder and president, and has a clear interest in the outcome of this trial. So I was reading this Board decision as having this first paragraph that says, Hey, all the evidence is just insufficient for some of these claim elements, and going into corroboration, but I want to know, did you actually appeal that? Did you address that in your briefing? Because really what I saw in your briefing was simply indefiniteness and corroboration. Well, so I understand what Your Honor is asking. The way we looked at this was they're taking issue with those pieces of evidence, which were meant to corroborate the inventor testimony, was an attack on the corroboration. That was the way we viewed it. I understand what you're asking. You didn't view it that way. So we believe that we did appeal it. In fact, the criticisms that Your Honor just went through to us is this, what the cases call an elements-based overly narrow attack on evidence, instead of using the rule of reason to look at this in its totality. For example, with respect to the LaBouffe Declaration, and one of the shortcomings there, they say that LaBouffe doesn't show how an emitter is supported by the housing. You can see it in the photo, the emitter within the housing. It says the photos don't show that there's internal connections. I'm not even sure what that means exactly, but there's not, the claims aren't about, I don't know what internal connections that are claimed that aren't shown. I don't believe that there are any. I think that that's pointing to something that's a non-issue. So to us, that Mr. Paik didn't know the inner workings of the prototypes. Well, he wasn't offered to testify about the inner workings. He was just somebody who actually had done the testing seven years ago and saw the prototypes and could say, yes, I did that, that happened, and I used those prototypes. And also, the board, and I think this is very significant, didn't even address the invoice from a third party for a molded, custom molded module and emitter, which was dated 15 months before the Haseley reference. What do you think the standard of review is that applies to our review of the board's determination under the rule of reason? Well, I think that that's a legal error not to apply the rule of reason, but I think to the extent that the court agrees with that, I do think that under NFC tech that it would likely need to be remanded to be analyzed under the correct standard. But in ordinary circumstances, corroboration is a question of fact, I think. Is that right? Correct. That's right. It's just here, the problem isn't just, we're not taking issue with a particular analysis of a particular fact, it's the totality of the evidence and the failure to analyze the totality of the evidence. Thank you, and we'll restore your three minutes. Thank you, Your Honor. Mr. Johnson. Thank you, Your Honor. Good morning, Your Honor. May it please the court. The court can affirm the board's findings on the original claims under either Numaga or Frayden and can affirm the board's findings on the amended claims either on obviousness or on the indefiniteness issues. And if we start with Numaga, which is where the court started, they're called light guide part in Numaga, 21B and 22B. They're expressly called light guide parts. The claim limitations that are issued are light guides. There's no question, as the board determined, the light guide parts in Numaga deliver light along a path from the light emitting chip down to the wrist and then back to a receiving chip. Can you address Mr. Kimball's point that at least in the institution decision and less clearly, but he says implicitly in the final written decision, the board included the 29 cladding as part of the light guide and whatever else is clear, your petition did not do that. Well, let me say first and foremost, the petition unequivocally did identify 21A and B as the light guides and then referenced. Maybe I was not clear. Let's talk about 29. Okay. So 29, the final, and I'll start with the final written decision. The final written decision does refer to, and it says specifically, that the light, let me just pull up. The page of interest seems to be, to Mr. Kimball, is page 17. And the part that I'm referring to is, right, so if we, and this is in the institution. No, the final written decision. It says Numaga explicitly discloses directing light guides with light guide parts and the patent owner's expert. I'm sorry, what are you reading from? I'm looking at page 17. And if we look at the. . . It's the top paragraph, last sentence. That's where I'm reading from, yes. Numaga explicitly discloses directing light with light guide parts and the patent owner's expert, Dr. Polonini, states that a properly designed light guide does not leak light. And if we go further on down to page 17 to the second full paragraph, the first sentence, we agree with petitioner. Right, so go a few sentences further. This is the sentence, I think, that Mr. Kimball quoted, six lines. . . Like the 965. Numaga teaches transmitting light from an emitter through a clad light guide. The cladding is 29, right? That's correct. The cladding is 29. So why does that not embody. . . I mean put the cladding as part of the light guide and why is that not inconsistent with what your petition says? Because all the board was doing in that one sentence there was comparing the overall system and the overall system of the 965 patent to the overall system in Numaga. And that's all it's doing at that point. And if we look specifically at this 965 patent and column 37, lines 15 to 19, it describes, and this is I think the point that you raised with Valence Health Council, quote, in some embodiments a light guide may be surrounded or partially surrounded by a cladding material 121 that is configured to block light from an external source from entering the light guide 119 and at least partially confine the light within the light guide 119. Maybe the institution decision becomes unimportant once the final written decision is written. But can you address, this is appendix 907, so it's page 17 of the institution decision, which seven lines down from the bottom says, shell support member 29 thereby provides a mechanism for delivering light along a path in a manner consistent with the broadest reasonable interpretation. That seems to place 29 as part of the light guide since it's quoting the definition of the light guide. But again, that's at the institution phase, Your Honor. And I submit the final written decision is what governs here. And this was early on in the process. And yes, there is this one sentence that refers to the shell support member 29 providing a mechanism for delivering light. But if you go back to the petition, the specific petition that was filed under the term light guide, it specifically referenced the light guide parts of 21A and 21B. And that is what we're here before this court on. The light guide parts in the MAGA specifically disclose the light guides that are referenced in the claims of the patent. And their only substantive argument is that the light guide parts alone don't confine the light to a path. And if you look at their opening brief, their own opening brief, the annotated version of the MAGA's prior art, this is figure 2B on page 29 of their brief. It's the one that has the five red arrows coming down. It shows that at least some light, one out of the five red arrows, is delivered along a path from 21A down to the wrist. That's the importance. That's the import of new MAGA. That's the overall system. And so in the final written decision, when the board was referring to like the 965 patent, the new MAGA also discloses light guides with cladding. That's what that reference was to. It wasn't including the cladding as the light guide. And it made clear, again, in the final written decision at page 17, when it says that the light guides in new MAGA are structurally equivalent to the light guides in the 965 patent. And it does not include the cladding in that sentence that's referenced in the final written decision. And if we go a little bit further, the light guide doesn't have to restrict or direct the light. It's only required that it be a mechanism for delivering light along a path. Delivering light is broader than directing, and it doesn't require the cladding. Light is delivered along a path in new MAGA, even without the cladding support number 29. And, again, you know, the board didn't rely on the combination of new MAGA's light guide parts and the cladding for this limitation in its final written decision. The board relied solely on the light guide parts and referred to the clad light guide only to highlight similarities, again, between the overall system in new MAGA and the 965 patent. And, again, if we look at the overall import of what they're both trying to do, they're trying to send light through these light guides, through these light guide parts to the wrist and then back up to detect physiological information. That's the import of all of these. Can we change subjects to the Fraden? Yes. What should we look to to figure out whether components that are not at the tip but nearish the tip are distal or not distal? We start with the claim language. The claim language is a distal end. It doesn't say the distal end. It's a distal end, right? And it's an end opposite the plot. Well, that could mean there might be multiple tips like the ends of octopi. And, in fact, the specification refers to that. I'm sorry. How does that tell us that components that are not at any tip would be distal but are on the sides near the tip of one to eight things? Well, again, the construction is an end opposite the proximal end. And when you look at, again, Appendix 13, 12 and 13 at the bottom in the final written decision, the board said a distal end, which, quote, is an end remote or opposite from the proximal end. That's what we're really talking about. In Fraden, the ribs are opposite and remote from the main body of what's disclosed. Let me just try to maybe ask this a different way. It certainly seems to me in my whatever knowledge I may have of the word distal that that is not limited to the very tip of something that is highly linear. But that's just in my head. So what else do I look at? His argument is the tip only counts. And there may be seven linear things, in which case there are seven tips. But the stuff at the side of the tip doesn't count. You look at the specification. The specification in column 37, lines 54 to 57, tells a person of ordinary skill in the art. It says, quote, free end 119C may branch out to two or more legs that may be used to couple with many different points of the body, such as multiple points of the ear. So where does that say what distal means? I mean, I get it that you're saying the specification discloses that there can be multiple sides or multiple tips at what opposing counsel has called the distal end, which can only be the very most tip. But the question is what in the specification helps us understand that distal is not just the tip but also includes anything, let's say, to the right of the middle? How do we know that? It's usually used in the context of proximal, right, proximal and distal. You think about it in terms of more in the mechanical arts. And it's not limited to a specific, the farthest point. It can be something that's towards the end. I mean, it's intentionally. But what evidence do we have of that? The claim language and the specification. I mean, obviously they're written towards a person of ordinary skill in the art, and a person of ordinary skill, particularly reading that section of the spec that I just read that suggests different branches touching different points of the ears and that those could be distal ends. That's firmly within the scope of the claim language in that sense. And that's clearly disclosed. Are you relying on every rib, 64, or are you just relying on the ribs to the very right that extend off of what we could all probably agree is the most distal point? All we need is one. I mean, it's a distal end. Well, I'm just trying to understand your theory. Is your theory that every one of the six ribs constitutes a distal end, or are you saying, well, the most distal point, there are two branches of ribs coming off of that distal point, and so that continuous end with the ribs coming off of them is the distal end? I'm saying that the one on the end certainly is a distal end, and using the court's own construction and the board's construction and Valencel's construction, and I'm looking at it from a person of ordinary skill in the art, and again, the language is a distal end, a distal free end. And certainly under the construction that the board adopted and the one that Valencel promulgated, the ribs 64, 84, et cetera, are distal ends. I know your time is running out. Can I ask you about on the motion, on the proposed amendment, put aside Paisley and the question of corroboration, can you explain first, I'm interested in the indefiniteness point that the board made. First of all, point me to the pages with the claims that I should be looking at for the amended claims. I have it on page 20. Well, let me find the appropriate. I have my own cheat sheet that I used from the brief, which is page 22 of our brief. It's appendix 2148 and starts at 2146. Okay, so tell me what the indefiniteness problem is. Well, first of all, the claims recite terms of degree and they lack the objective boundaries. Put that aside. So if we look specifically at claim 13, and it's the language, you know, a substantially flat-faced surface narrowing a field of view of the first light guide and then a substantially flat-faced surface as. The real issue is that there's no objective boundary for evaluating what the narrowing part that's referred to is and what the field of view is. Isn't it true that the specification just discloses either flat-faced or the other term, if I remember correctly, is curved. Is that right? Or is it rounded? Curved. Curved. And it's the only two it discloses, and it says that the flat-faced is, I believe, narrowed relative to the curved, and the curved is widened relative to the flat. I might have them reversed, but there's no other point of reference provided in the specification. Well, the issue becomes, so what's the field of view that's narrowed and what is it narrowed relative to? Why aren't they relative to one another? Because at what point does a substantially flat surface that narrows a field of view encroach upon a flat surface that does not narrow a field of view? What if they all do it? If the specification says that the substantially flat surface narrows the field of view relative to the curved surface, why isn't that perhaps very broad and not very meaningful, but not indefinite? Because if I'm a person of ordinary skill and you're trying to avoid the scope of this claim, how do I determine what is narrowed relative to the field of view that I have? I'm asking why isn't it relative to a curved surface? I think it is relative because at what point does a curved surface become a flat surface, right? A substantially curved surface become a substantially flat surface. Where do those start to intersect? That's what the issue is, is ultimately you get down to certain areas where you can't tell as a person of ordinary skill whether it's a substantially curved surface or a substantially flat surface. Just remind me, the evidence on that question, what a relevant skilled artisan would or would not understand is what? The evidence that we submitted in that respect? Yes. A lawyer is saying it doesn't really count for anything. Yes, we have an expert declaration that we submitted in that context. Is indefiniteness, should we be looking at that in this context as a question of law, a mixed question of law and fact? What is the standard of review that applies? I think it's a mixed question of law and fact. Like claim construction, there's underlying issues of fact? There are underlying questions of fact, and we submitted the declaration of Dr. Zarafzadeh in support of the indefiniteness argument as well. Unless you, Your Honor, have any other further questions with respect to corroboration or anything else? Anything else. Thank you. Your Honor, since I didn't get to reach it, I wanted to start with the indefiniteness arguments, if that's fine. With respect to substantially flat-faced surface nearing a field of view, we don't think that that is indefinite under the appropriate standards for a couple of reasons. First of all, substantially flat-faced has an objective baseline. We all know what flat is. Is it shown in the figures of the patent? Sure. Figure 26 shows distal ends that are flat, and figure 31 shows that distal ends are curved. There's discussion around this and on the way that light behaves depending upon which sort of end you're using. This is the area that you were referring to with Fitbit's counsel. Is it your view that substantially flat allows for a little bit of curve? I think that the answer to that is the reason why we say substantially flat is because perfect flatness might be difficult to achieve. And patent law allows for using a word like substantial so that you don't have a claim that has to be mathematically provably absolutely flat. But we're not trying to have that term encompass some curve. That's the distinction between substantially flat-faced in Substitute Claim 13 and substantially curved in Substitute, I think it's 24, is to talk about a real difference which affects light in a different way. So is the answer no? Yes. Yes, the answer is no. That's all I'm looking for. I saw that in your brief you directed us to column 35 of the patent and figures 24A through B and 31 for disclosure of what the round and flat surfaces of the light guides are. Are there any other portions of the patent that talk about this? I couldn't find any, but I want to make sure I didn't miss anything. I just wanted to look quickly and see if there's another figure that I'm leaving out here. That discussion that we referenced, and that's in column 35, 55 through 61, the top of 36, and figures that show this include the ones you highlighted. Also, yes, there are others. 26 and 31. 26 is one that has two different light guides, each with a distal and a proximal end. But flat ends is the point with respect to this. Is there some threshold degree of curve that creates a widening of the field of view? Like maybe let's say the most minor of curves, would that widen the view necessarily? Compared to flat, yes, is the answer. Incrementally. So the most mildest of curves would satisfy the limitation of substantially curved. I don't know that that is correct. Because, again, and I just want to answer the question straightforwardly, I don't think that's correct. The language narrowing a field of view, widening a field of view, that's functional, obviously, language. These are apparatus claims. It's meant to describe what those flat and round surfaces do. I don't think that they are limiting. That's one thing. Secondly, I did want to say because the antedating argument only relates to Claim 13, I think the focus ought to be on Claim 13. In other words, the Claim 14 that includes the substantially curved is not a part of the appeal on antedating. So the main term for focus really is substantially flat-faced, narrowing a field of view. I want to ask you one other thing. I'm sorry. The board cited some testimony, I think it was of your expert, where they said that it's possible that it could be falling under the virtue of either one claim or the other. That seems kind of problematic with respect to definiteness of the claims. How are we supposed to understand that? Why is that not problematic? In his testimony, he talked about unequivocally flat and unequivocally curved. As they examined him, they started to get into some gray areas that I think are not realistically at issue. In other words, I think a person of ordinary skill in the art, and this is what he said, understands what a flat-faced surface is and what that will do to light. So a slight curve, as Jess Chen was suggesting, that maybe is perceptible under a microscope or whatever, is not what this person of ordinary skill is considering flat-faced. On the contrary, a curved surface like the one in Figure 31 is apparent to a person of ordinary skill, and they're going to understand that that is going to widen the field of view. So I think in that context, the comment that if you bring these curves and flatnesses down to where they're just infinitesimal differences between each other, there might be a gray area there. But I don't think that that's a mathematical precision issue, which is not the standard under indefiniteness. It's reasonably certain. And here, in view of the specifications description, in view of the inventor's testimony, we think it's clear that a person of ordinary skill understands why you would use a flat-faced surface to narrow the field of view. An example I referred to earlier is in the ear where you're trying to really focus light in a particular area. But there is enough difference between substantially flat and substantially curved that something couldn't be both? Yes, I think that's right. I think you're either... yes. You're either one or the other? Is it possible that you can be neither? I don't know the answer to that last question. I think the answer is no. I think you've got to be one or the other. You get everybody, every which way. That's not the intention, but... Maybe it is. Thank you for your argument. Thank you, Your Honor. Both counsel. I assume nobody's moving at this, for the next case?